08 CV 6715

United States District Court
Southern District of New York

```
------------------------------------------------------ X
Edward D. Fagan,                        :          Civil Action #
                          Plaintiff     :
                                        :
     - v -                              :
                                        :
Republic of Austria,                    :
Austrian National Bank,                 :
Vermittlungskommission Brandkatastrophe Kaprun,:
        a/k/a The Kaprun Commission,    :
Gletscherbahnen Kaprun AG,              :
Österreichische Elektrizitätswirtschafts-AG,    :
Generali Versicherung AG,               :
                          Defendants    :
------------------------------------------------------X
```



(with jury demand)

As and for his complaint against Defendants, and upon information and belief, Plaintiff

hereby declares and says:

### Jurisdiction & Venue

1)    The Court    has original jurisdiction over the claims against Defendants Republic of

Austria, Austrian National Bank, Vermittlungskommission Brandkatastrophe Kaprun

a/k/a The Kaprun Commission, Österreichische Elektrizitätswirtschafts-AG, pursuant to

28 USC  § 1330 (a) and 1605 (a) (3) and (5).

2)    The Court has jurisdiction over claims against Defendants Gletscherbahnen Kaprun AG,

Österreichische Elektrizitätswirtschafts-AG and Generali Versicherung AG, pursuant to

28 USC § 1332.

3)    Defendants are subject to long arm and *in rem* jurisdiction pursuant to CPLR §§ 301 and

302.

4)    Defendant Austrian National Bank maintains offices in New York City at 745 5th Ave,

New York, NY 10151+0001 and also maintains employees, bank accounts, phones, faxes

and other assets within this judicial district.

5)    Defendant Gletscherbahnen Kaprun AG has offices and/or agents through which it
      advertises and/or conducts business in New York City at 500 5th Ave, New York and 120
      W 45th St # 9, New York and also does business within this judicial district.

6)    Defendant Österreichische Elektrizitätswirtschafts-AG conducts regular and systematic
      business in New York, and has accounts and other assets within this judicial district.

7)    Defendant Generali Versicherung AG is part of the Generali Group which maintains
      offices in New York City at 1 Liberty Plaza # 29, New York, NY 10006 and maintains
      employees, bank accounts, phones, faxes and other assets in this judicial district.

8)    Venue is proper in this district as Defendants Republic of Austria, Austrian National
      Bank and Generali Insurance, maintain offices, all Defendants conduct or solicit business,
      have employees, officers and/or agents in this judicial district and many of the acts upon
      which this complaint is predicated occurred or had impact in this judicial district.

**Parties**

9)    Plaintiff Edward D. Fagan ("Fagan") is a lawyer with an office at 5 Penn Plaza, 23rd
      Floor, New York, NY 10001.

10)   Defendant Republic of Austria ("Republic") is a foreign sovereign that for purposes of
      this lawsuit engaged in actions that were designed to discriminate against and interfere
      with Plaintiffs' rights, freedoms and property rights.

11)   Defendant Austrian National Bank ("Bank") is an organ, entity, agency and/or agent of
      Defendant Republic responsible for protecting Plaintiff Fagan's liens and property, as
      described below.

12)   Defendant Vermittlungskommission Brandkatastrophe Kaprun ("The Kaprun
      Commission") is an organ, entity, agency and/or agent of Defendant Republic, that was

appointed and empowered by The Austrian Federal Ministry of Justice and conducts business at and through the offices of The Austrian National Bank in Austria.

13)    Defendant Gletscherbahnen Kaprun AG ("GBK") is a private company located at Wilhelm Fazokas Straße 690 5710 Kaprun, Austria and is engaged in promotion of tourism and special events from individuals, entities or groups in the United States.

14)    Defendant Österreichische Elektrizitätswirtschafts-AG ("Verbund") is a private company located at Am Hof 6a A-1010 Vienna that owned in part by Defendant Republic and Defendant Verbund in turn own a blocking majority and control of Defendant GBK.

15)    Defendant Generali Versicherung AG ("Generali") is a private insurance company with principal offices located at Landskrongrasse 1-3, Vienna, Austria and is the insurer for Defendants GBK and Verbund.

16)    Defendants Republic, Bank, GBK, Verbund and Generali and/or their agents are members of and are responsible for acts of The Kaprun Commission, including certain of the acts complained of herein.

17)    Defendants Republic, Bank, The Kaprun Commission, GBK, Verbund and Generali shall be collectively referred to as "Defendants".

#### Facts

18)    Plaintiff is a controversial, victims rights and/or activist lawyer whose help was sought by and who worked for many of the Kaprun victims, survivors and families.[1]

---

[1]    Plaintiff Fagan gained notoriety in Austria as a result of his efforts for Holocaust victims including efforts to achieve restitution and damages from Austrian Banks, Insurance Companies, Financial Institutions, Government owned and private entities/businesses that profited from collaboration with the Nazis and which never accounted to Holocaust victims for their wrongful acts, most recently including wrongful taking, expropriation and other wrongful acts related to looted artwork. Plaintiff Fagan's activities in Austria in relation to the Kaprun disaster started while certain Holocaust related claims were ongoing and continued. Plaintiff Fagan is/was counsel of record in dozens of complaints that were filed for Kaprun victims, survivors and their families in this judicial district, which have been consolidated under, or marked related or member cases, under Master Docket # 01-md-1428 (SAS). Plaintiff Fagan was disqualified in Aug. 2007 and an appeal of the disqualification Order is pending.

19) Certain Defendants and their agents did not like or approve of Plaintiff Fagan's actions, use of US Courts in which to bring claims for victims' rights or his open litigation and public relations activities.

20) Certain Defendants and their agents considered Plaintiff Fagan's aforesaid actions, activities and fight for victims' rights, as a threat them financially, to their property / business interests and to their tourist industry.

21) On November 11, 2000, a fire broke out on a train and in a tunnel owned and/or operated by Defendant GBK and Verbund. The fire killed 155 people, including 92 Austrian nationals, 37 German nationals, 10 Japanese nationals, 8 American nationals, 4 Slovenian nationals, 2 Dutch nationals, with only 12 people, including 10 German nationals and 2 Austrian nationals, from the train who escaped the fire. The victims and survivors shall be collectively referred to as "Kaprun victims, survivors and families".

22) As a result of Fagan's prior Holocaust litigation and diplomatic experiences with the Austrian and German government and companies, Kaprun victims, survivors and their families sought Plaintiff Fagan's assistance with regard to a variety of issues that were of concern to them. These included but were not limited to:

   a) Organizing meetings with Austrian officials at local, State and Federal levels, including investigating judges, prosecutors, coroners and others involved in the Kaprun disaster;

   b) Organizing meetings with officials and/or representatives of Defendants Republic, GBK and Verbund in an attempt to gather information about the disaster and to seek ways to potentially avoid litigation;

   c) Assisting in the expedited identification and return of personal affects;

   d) Expediting delivery of autopsy findings to victim families, as well as locating and identifying how unidentified body parts were disposed of and how the remains came to

be buried in common graves;

e) Pushing for interim assistance for and securing *ex gratia* payments to families in need;

f) Lobbying public officials for changes in the safety standards to help protect against future disasters and to protect innocent tourists visiting Austria;

g) Lobbying for public apologies and for acceptance of responsibility for the disaster;

h) Locating and interviewing witnesses and evidence to assist the families understand how the disaster occurred and which companies were responsible;

i) Locating witnesses and evidence related to the disaster;

j) Lobbying Austrian governmental officials to create and empower a Commission, similar to the Austrian and German Commissions Plaintiff Fagan worked on in Holocaust cases, to address issues of just compensation for Kaprun victims, survivors and families; and

k) Filing damages claims in the US and assisting with prosecutions in Austria and Germany.

23) During the period from November 11, 2000 to present, as Plaintiff Fagan continued to work for Kaprun victims, survivors and families, Defendants sought to protect their individual businesses and interests, as well as their interests in Defendant GBK.

24) Defendants Republic, GBK, Verbund and Generali sought to evade accounting for their wrongful acts, avoid failures in the safety standards being exposed, avoid necessary remedial actions necessary, minimize the impact on their businesses, assets and tourist industry and in the end minimize damages they would have to pay to Kaprun victims, survivors and families.

25) In response to Plaintiff Fagan's efforts and actions on behalf of Kaprun victims, survivors and families, Defendants Republic, GBK, Verbund and Generali sought to prevent the public from discovering the truth about how the fire broke out and which entities were responsible for the fire.

5

26) Plaintiff Fagan formed an international team to work on behalf of Kaprun victims, survivors and families. This team included US, Austrian, German, Swiss and Japanese lawyers, law professors, experts, consultants, investigators and public relations persons, dedicated to advancing the rights and interests of Kaprun victims, survivors and families.

27) Plaintiff Fagan and the team represented and/or worked on behalf of the interests of 65 – 80 % of all Kaprun victims, survivors and families.

28) Plaintiff Fagan and his team (i) initiated claims for equitable relief and damages in the United States and limited claims in Austria and Germany and (i) participated in certain aspects of the Criminal Investigation and/or prosecutions in Austria and Germany.

29) As the actions of Plaintiff Fagan and his team yielded more results that affected the interests of Defendants Republic, GBK and Verbund and the insured interests of Defendant Generali, they in turn became more evasive and less cooperative with Plaintiff Fagan and Kaprun victims, survivors and families.

30) Defendants Republic, GBK, Verbund and Generali objected to efforts by Plaintiff Fagan and his team undertook in the US and Europe, including the efforts to compel Defendant Republic, Verbund, GBK and others to fully disclose evidence, accept responsibility for the disaster, improve safety standards in Austria and provide just compensation to Kaprun victims, survivors and families.

31) Plaintiff Fagan and his team discovered evidence confirm that Defendants and/or their agents destroyed evidence, concealed causes of action, violated Court Orders, interfered with witness testimony and criminal investigations, harassed and intimidated whistleblowers and others who sought to expose the truth and took other acts in an attempt to conceal evidence, liability and causes of action.

32) Plaintiff Fagan and his team's discoveries about certain causes of the disaster, entities

responsible and how the Austrian investigation and prosecution was flawed, exposed

Defendants and others to embarrassment, loss of reputation, business and damages.

33) In response to Plaintiff Fagan's and his team's efforts and investigations, Defendant

Republic, GBK and others and/or their agents conspired to and/or engaged in efforts to

restrict Plaintiff Fagan on a more personal basis. These included efforts to deter Plaintiff

Fagan through acts of discrimination, restriction of Plaintiff Fagan's freedoms of

movement and attempts to deprive Plaintiff Fagan of his property rights. The acts taken

against Plaintiff Fagan included:

a) Interference with Plaintiff Fagan's freedoms of speech and association because of the

Kaprun victims and survivors he represented and on whose behalf he worked [2];

b) Improper release of false reports to media [3] so as to interfere with Plaintiff Fagan's

movements and to cause him to lose clients, to cause him to be subjected to humiliation,

ridicule and loss of property;

c) Initiation of false investigations [4] designed to interfere with Plaintiff Fagan's movements

and to cause him to lose clients, to cause him to be subjected to humiliation, ridicule and

---

[2] While in Austria doing business related to the Kaprun case, Plaintiff Fagan was entitled to protections of Article 47 of the Charter of Fundamental Rights of the European Union and Article 13 of the European Convention on Human Rights. Those rights and freedoms included the right of effective remedy before an impartial and neutral tribunal.

[3] As Plaintiff Fagan's activities in Austria escalated and the potential damages which they faced as a result of Plaintiff Fagan's work, certain Defendants were involved with the release to the media of reports were that Plaintiff Fagan supposedly had sex with a 17 & ½ year old -under aged - Lithuanian prostitute named Inga, which reports Defendants knew were not false. Defendant Republic opened and for years refused to close an investigation, that lacked supporting evidence, to retaliate, intimidate restrict or "interfere" with Plaintiff Fagan's freedoms, movements and activities and to thereby cause him damages.

[4] Certain Defendants conspired together to make false accusations so as to thereby initiate investigations that they intended to keep open without credible evidence, contrary to the facts, knowing there was no basis for the investigation, but which they intended to use to restrict Plaintiffs movement, cause him to expend monies unnecessarily and with which they sought to intimidate, frighten and harass Plaintiff Fagan. In this regard, as a direct result of Defendants actions, Plaintiff Fagan remained under a cloud of suspicion, subject to restrictions on his movements and wrongful taking of his property for more than 3 years.

loss of property;

d)  Making of false reports to authorities and the media [5] during or related to the Kaprun investigation and criminal proceedings in Austria designed to interfere with Plaintiff Fagan's movements and to cause him to lose clients, to cause him to be subjected to humiliation, ridicule and loss of property;

e)  Fraudulently inducing Plaintiff Fagan into participation in The Kaprun Commission;

f)  Misrepresentations to Plaintiff Fagan about activities of The Kaprun Commission;

g)  Fraudulently inducing Plaintiff Fagan into believing that his property rights to attorneys fees and expense reimbursement would be respected and honored through any settlement negotiated and/or concluded through The Kaprun Commission;

h)  Discrimination against Plaintiff Fagan due to his beliefs, national origin, associations and business, including the fact that he is an American not an Austrian lawyer [6]; and

i)  Misrepresentation and creation of contracts that were designed to deprive Plaintiff Fagan of his property and rights to property [7].

34)  From November 2000 to present, Defendants were on notice of the liens that Plaintiff and his team have to payment of legal fees and reimbursement of expenses.

---

[5]  Certain Defendants conspired together and with others to make false statements accusing Plaintiff Fagan of being involved with the Kaprun disaster, of concealment of evidence, of being a material witness and as a result restricted Plaintiffs movement, cause him to expend monies un-necessarily and through which they sought to intimidate, frighten and harass Plaintiff Fagan. Defendant GBK for example also made statements to the media in which they intentionally misrepresented, facts, evidence and theories of liability.

[6]  Defendants permitted all lawyers to make application for certain fees and expense reimbursement related to representation of Kaprun victims and survivors, except Plaintiff Fagan and other American lawyers.

[7]  The "Settlement" and "Release" documents that were created by Defendants were designed to discriminate against Plaintiff Fagan and other US lawyers based on their representation of Kaprun victims, survivors and families representatives with claims in the United States. The Settlement and Release are discriminatory, are in violation of the contract and representations made to Plaintiff, fail to provide customary and bargained for mechanisms, were not prepared in accordance with the representations made to Plaintiff Fagan and others, purport to improperly and unlawfully deprive Plaintiff and others of their property and rights.

35) Most recently, Defendants sought to defraud Plaintiff and steal his property, to wit: his legal fees and expense reimbursement.  Defendants did this by inducing Plaintiff Fagan to participate in The Kaprun Commission negotiations, executing Confidentiality Agreements that previously prevented Plaintiff Fagan from disclosing facts related to The Kaprun Commission negotiations and agreeing to certain protocols that were supposed to fairly address and provide mechanisms and alternate dispute resolution format for Kaprun victims, survivors and families to have could be amicably resolved.

36) Defendants or their agents took, authorized or allowed others to take actions that:

a) Discriminated against Plaintiff Fagan and his team, and his clients, just because they sought to litigate claims in the United States;

b) Discriminated and retaliated against Plaintiff Fagan and his team because he/they spoke out against and exposed, among other things:

    i) Defendant Republic's handling of the Kaprun criminal investigation and prosecution

    ii) Dangers inherent in Austrian tourist facilities such as the GBK / Verbund facility;

    iii) Defendant Republic, GBK, Verbund and Generali's inadequate insurance coverage for tourists visiting Austrian tourist facilities;

    iv) Defendant Republic, GBK and Verbund's inadequate safety inspections and standards for component parts and systems, including those coming from the United States;

    v) Defendant Republic, GBK, Verbund and/or Generali's failures to preserve or authorized destruction of or concealment of evidence and concealment of causes of action, against Austrian, German and US companies, related to the Kaprun disaster;

    vi) Defendant GBK's intimidation of witnesses with knowledge related to the Kaprun disaster; and

    vii) The waste and/or improper use of monies from Defendant Generali's insurance policy

and which wasted or depleted funds that would otherwise have been available to

provide relief to Kaprun victims, survivors and families;

viii)   Discriminated against US lawyers working on behalf of Kaprun victims, survivors

and families who wished to prosecute claims in the United States.; and

ix) Public lack of respect for the dignity of Kaprun victims, survivors and families;

c)  Deprived Plaintiff Fagan and his team of property and rights, including fees and expense

reimbursement; and

d)  Otherwise defrauded Plaintiff Fagan and Kaprun victims, survivors and families.

37)   To facilitate and assist in the taking or conversion of Plaintiff Fagan's property, fees and

expense reimbursement, Defendants, through The Kaprun Commission, created and used

documents that, among other things, failed to comply with negotiated/accepted standards

and which documents were used to deceive Kaprun victims, survivors and families. [8]

38)   In the last few weeks, Plaintiff Fagan discovered that in addition to the other acts as

explained above taken against Plaintiff Fagan, that Defendants or their agents engaged in

a plan, scheme and design through which they intended to violate and disregard the liens

for payment fees and reimbursement of expenses due to Plaintiff Fagan and his team.

39)   Defendants knew of Plaintiff Fagan's and his team's efforts in Germany, Austria, the

Netherlands, Slovenia and Japan.

40)   Defendants knew of Plaintiff Fagan's collection of evidence and proofs of liability in the

pending or anticipated claims against Defendant Republic, GBK, Verbund, and other

Austrian, German and US companies, including component part manufacturers and

---

[8]     The documents included draft purported Settlement Agreements, Releases and claims valuation tables, and
which were never formally finalized, never translated into the respective languages of the Kaprun victims, survivors
and their families and/or which had other defects.  See Exhibit 1 & 2 for redacted versions of the purported
"Settlement" & "Release" documents

suppliers, involved in Kaprun disaster.

41) Defendants knew of Plaintiff Fagan's attendance at Court hearing and sessions in the United States and Austria.

42) Defendants knew of Plaintiff Fagan's involvement in the transition of The Kaprun Commission from a committee designed to only address how to make things safer in Austria and to learn from the Kaprun disaster into a potential vehicle through which Kaprun victims, survivors and their family claims could be addressed, including potential creation of mechanisms for resolution of claims and just compensation.

43) Defendants knew that Plaintiff Fagan's team included Austrian, German, Japanese and US lawyers and professionals who invested time, resources and monies to help advance the claims and who are entitled to deferred fees and reimbursement of expenses.

44) At the end of June 2008, Plaintiff Fagan learned that Defendants entered into a $21.5 million Settlement through which they sought to resolve some claims of Plaintiff Fagan's former clients – including certain Austrian, Dutch, German, Japanese and Slovenian Kaprun victims, survivors and families - and which triggered Plaintiff Fagan's entitlement to certain fees and expense reimbursement. *See Exhibit 3.*

45) On or about July 15, 2008, Plaintiff Fagan learned that Defendants entered into an unannounced and undisclosed Settlement with other of Plaintiff Fagan's former clients – the US Kaprun victims and their families – which on information and belief, is estimated at between $2.5 – 5 million for US victims and their families which also triggers entitlement to certain fees and expense reimbursement. *See Exhibit 4.*

46) Defendants knowingly and intentionally failed to honor Plaintiff Fagan's lien.

47) Defendants knowingly and intentionally failed to protect the property and monies belonging to Plaintiff Fagan and his team from the $ 24 – 26.5 million settlements.

48) Defendants knowingly and intentionally violated the liens that existed in favor of Plaintiff Fagan and his team for payment of fees and reimbursement of expenses from the settlements purportedly reached in or through The Kaprun Commission.

### Count I – Discrimination & Retaliation

49) Plaintiff repeats each of the allegations of ¶¶ 16 to 48 as set forth above, as if the same were set forth fully and at length herein.

50) Certain Defendants and their agents used their positions to discriminate and retaliate against Plaintiff Fagan, because of (i) his occupation, associations, beliefs and efforts to help Kaprun victims, survivors and families and (ii) his efforts to expose deceit, misrepresentations, safety failures, inadequate inspection practices and standards and other failings in Austrian standards or systems related to the Kaprun disaster.

51) Defendants' aforesaid acts violate NY law, US law, European Law, Article 47 of the Charter of Fundamental Rights of the European Union, and Article 13 of the European Convention on Human Rights.

52) As a direct and proximate result of Defendants' aforesaid acts, Plaintiff Fagan suffered damages, including monetary and non-monetary damages and damages for which no adequate remedy at law exists.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally or in the alternative for (i) compensatory damages in the amount of Fifty Million Dollars [9], (ii) exemplary, special and/or punitive damages in the amount of One Hundred Million Dollars [10],

---

[9]    Plaintiff Fagan will place all compensatory damages awarded in excess of Ten Million Dollars in a Fund for the benefit of his team members and the Kaprun victims, survivors and the families on whose behalf he worked and which in part caused him to be a target of Defendants aforesaid wrongful, discriminatory and retaliatory acts.

[10]    Plaintiff Fagan will place all exemplary, special and/or punitive damages awarded in excess of Ten Million Dollars in a Fund for benefit of Kaprun victims, survivors and the families and other victims on whose behalf

(iii) interest, fees and costs of this action and (iv) such equitable relief as is appropriate and just.

## Count II – Fraud & Misrepresentation

53)   Plaintiff repeats each of the allegations as set forth above in ¶¶ 16 to 48, as if the same were set forth fully and at length herein.

54)   Defendants (i) misrepresented their intentions to Plaintiff Fagan, (ii) convinced Plaintiff Fagan to cooperate with and participate in The Kaprun Commission, and (iii) convinced Plaintiff Fagan that Defendants would recognize and honor his property rights and interests and safeguard monies he earned and for which liens existed for claims made, work done and benefits achieved for Kaprun victims, survivors and families.

55)   Plaintiff Fagan had a right to rely Defendants aforesaid statements and had no way of knowing Defendants statements were untruthful or that they intended to defrauded him or his team.

56)   Plaintiff Fagan relied on Defendants' aforesaid misrepresentations to his detriment.

57)   As a direct and proximate result of Defendants' aforesaid acts, Plaintiff Fagan suffered damages, including monetary and non-monetary damages and damages for which no adequate remedy at law exists.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally or in the alternative for (i) compensatory damages in the amount of Fifty Million Dollars [11], (ii) exemplary, special and/or punitive damages in the amount of One Hundred Million Dollars [12], (iii) interest, fees and costs of this action and (iv) such equitable relief as is appropriate and just.

---

Plaintiff Fagan has worked against Austrian government or private owned companies and which in part caused him to be a target of Defendants' aforesaid wrongful, discriminatory and retaliatory acts.

[11]     See Footnote # 9 above.

[12]     See Footnote # 10 above.

13

## Count III – Deprivation of Property Rights

58) Plaintiff repeats each of the allegations as set forth above in ¶¶ 16 to 48, as if the same were set forth fully and at length herein.

59) Defendants knew that as a result of Plaintiff Fagan's and his team's efforts from November 2000 to July 2008, Plaintiff Fagan earned and had property rights to certain fees and rights to expense reimbursement.

60) Defendants knew that the property rights that Plaintiff Fagan and his team earned was for both the actual monetary settlements that were achieved, as well as the other intangible benefits that were achieved for Kaprun victims, survivors and families.

61) Defendants knew that Plaintiff Fagan had property rights to the $ 24 - $26.5 million in actual settlement monies.

62) Defendants knew that Plaintiff Fagan's property rights were to reimbursement of expenses and share of 1/3 attorneys' fees, based on a $ 21.5 million gross settlement amount for Austrian, Dutch, German, Japanese and Slovenian Kaprun victims and that the approximate amount was $ 1.95 – $ 2.46 million.

63) Defendants knew that Plaintiff Fagan's property rights were to reimbursement of expenses and share of 1/3 attorneys' fees, based on the $ 2.5 – 5 million gross settlement amount for US Kaprun victims and their families is between $ 167,000 - $ 500,000.

64) Defendants knew that Plaintiff Fagan's property rights were also based upon the intangible yet substantial benefits Plaintiff Fagan also achieved for all Kaprun victims, survivors and families for things such as (i) Organizing meetings with Austrian local, State and Federal officials, including investigating judges, prosecutors, coroners and others involved in the Kaprun disaster; (ii) Organizing meetings with representatives of Defendant GBK to try to gain preliminary information about the disaster; (iii) Assisting

14

in the expedited identification and return of personal affects; (iv) Expediting delivery of autopsy findings to victim families; (v) Locating and identifying how unidentified body parts were disposed of and how the remains came to be buried in common graves; (vi) Pushing for interim assistance for and securing *ex gratia* payments to families in need; (vii) Lobbying public officials for changes in the safety standards to help protect against future disasters and to protect innocent tourists visiting Austria; (viii) Lobbying for public apologies and for acceptance of responsibility for the disaster; (ix) Locating and interviewing witnesses and evidence to assist the families understand how the disaster occurred and which companies were responsible; (x) Locating witnesses and evidence related to the disaster; and (xi) Lobbying Austrian governmental officials to create and empower a Commission, similar to that Plaintiff Fagan assisted in creating in Holocaust Restitution cases, to address issues Kaprun victims, survivors and families claims.

65)    Defendants failed to protect or deprived Plaintiff Fagan of his property rights.

66)    Defendants' failure to protect or to deprival of Plaintiff Fagan's property rights was knowing, intentional and wrongful.

67)    As a direct and proximate result of Defendants aforesaid acts, Plaintiff Fagan [13] suffered damages, damages, including monetary and non-monetary damages and damages for which no adequate remedy at law exists.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly, severally or in the alternative for (i) compensatory damages in the amount of Fifty Million Dollars [14], (ii)

---

[13]    Plaintiff Fagan also includes team members whose rights and interests are derived from Plaintiff Fagan.

[14]    See Footnote # 9 above.

exemplary, special and/or punitive damages in the amount of One Hundred Million Dollars [15],

(iii) interest, fees and costs of this action and (iv) such equitable relief as is appropriate and just.

### Count IV – Theft, Conversion and/or Improper Release of Plaintiff's Monies Owed For Statutory Lien and Lien Based on Common Benefit & Catalyst Theory of Settlements

68)    Plaintiff repeats each of the allegations as set forth above in ¶¶ 16 to 48 and ¶¶ 59 to 66, as if the same were set forth fully and at length herein.

69)    Defendants were on notice of Plaintiff Fagan's lien and property rights to fees and expense reimbursement (i) based on the $24 – 26.5 million settlements and (ii) based on intangible benefits achieved for Kaprun victims, survivors and families.

70)    Defendants failed to protect Plaintiff Fagan's lien and property rights.

71)    Defendants' failure to protect Plaintiff Fagan's lien and property rights was knowing, intentional and wrongful.

72)    As a direct and proximate result of Defendants aforesaid acts, Plaintiff Fagan [16] suffered damages, including monetary and non-monetary damages and damages for which no adequate remedy at law exists.

WHEREFORE, Plaintiff demands judgment against Defendants jointly, severally or in the alternative for (i) compensatory damages in the amount of Fifty Million Dollars [17], (ii) exemplary, special and/or punitive damages in the amount of One Hundred Million Dollars [18], (iii) interest, fees and costs of this action and (iv) such equitable relief as is appropriate and just.

---

[15]    See Footnote # 10 above.

[16]    See Footnote # 13 above.

[17]    See Footnote # 9 above.

[18]    See Footnote # 10 above.

## Count V — Pre-Judgment Attachment to Secure Payment of Liens

73) Plaintiff repeats each of the allegations as set forth above in ¶¶ ¶¶ 16 to 48 and ¶¶ 59 to 66 and ¶¶ 69 to 71 and as if the same were set forth fully and at length herein.

74) CPLR § 6201 *et seq* provides in pertinent part that:
   *. . . An order of attachment may be granted . . . where . . . plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more defendants, when . . . defendant is a non-domiciliary residing without the state, or is a foreign corporation not qualified to do business in the state; . . . or . . . defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts . . . .*

75) Defendants were on notice of Plaintiff Fagan's lien and property rights to fees and expense reimbursement (i) based on the $24 – 26.5 million settlements and (ii) based on intangible benefits achieved for Kaprun victims, survivors and families.

76) Defendants failed to protect Plaintiff Fagan's lien and property rights.

77) Defendants' failure to protect Plaintiff Fagan's lien and property rights was knowing, intentional and wrongful.

78) Plaintiff Fagan demanded and is entitled to a money judgment against Defendants.

79) Defendants (i) are non-domiciliaries residing without the state and (ii) are foreign corporations not qualified to do business in the state.

80) Defendants, with intent to defraud, Plaintiff Fagan or in an effort to frustrate Plaintiff Fagan's ability to secure or enforce a judgment rendered in his favor, has assigned or disposed and/or allowed conversion of Plaintiff Fagan's property.

81) Defendants refused to cooperate with Plaintiff Fagan with regard to the payment of attorney's fees and expense reimbursement and interfered with Plaintiff Fagan's good faith efforts to insure that the liens were protected and his monies safeguarded.

82) Defendants concealed and/or withheld documents and misrepresented facts in a way that has damaged and continues to damage Plaintiff Fagan's rights and his ability to secure

and obtain the return of his monies.

83)   Based on the facts as set forth above, (i) there is a likelihood of success on the merits of

Plaintiff Fagan's claims, (ii) there is and will be no prejudice to Defendants resulting

from a pre-judgment attachment, and (iii) there will prejudice to Plaintiff Fagan if a pre-

judgment attachment is not granted.

**WHEREFORE**, Plaintiff Fagan requests the Court grant a pre-judgment attachment

pursuant to CPLR §§ 6210 and 6211 against Defendants for (i) compensatory damages in the

minimum amount of $ 6 million dollars to secure the judgment at the conclusion of this case and

(iii) attorneys fees, interest and costs of suit.

Dated: July 2 8, 2008

Edward D. Fagan Esq.,
5 Penn Plaza, 23rd Floor
New York, NY   10001
Tel (646) 378-2225
Email:  faganlaw.kaprun@gmail.com

18

# EXHIBIT   1



*Purported Settlement Document*

# VERGLEICH

## *mit sämtlichen Anspruchstellern*

# SETTLEMENT

## (judicial) with all claimants

### zwischen



### Gletscherbahnen Kaprun AG, FN 54515w

Wilhem Fazokas Strasse 690, 5710 Kaprun und

### Republik Österreich

| | |
|---|---|
| 1.)*Gletscherbahnen Kaprun AG* und die Republik Österreich verpflichten sich den Vergleichsbetrag von EUR ▓▓▓ (EUR ▓▓▓ bereits abgezogen) (in Worten EURO einundvierzigtausendzweihundertdreiundsiebzig) binnen drei Wochen ab der schriftlichen Verständigung des Vorsitzenden, oder im Verhinderungsfall dessen Stellvertreter, der vom Bundesminister für Justiz eingesetzten Vermittlungskommission, dass der Vergleich rechtswirksam ist, an den unterfertigten Anspruchsteller auf das Konto | 1.)*Gletscherbahnen Kaprun AG* and the Republic of Austria covenant to pay the settlement amount of EUR ▓▓▓ (EUR ▓▓▓ already deducted) (number in words fortyonethousandtwohundredandseventythree) within three weeks following the written notification by the chairman, or in case of being prevented by the deputy-chairman of the mediation commission *(Vermittlungskommission)* appointed by the Austrian Federal Minister for Justice that the settlement is legally effective to the releasing party to the |
| mit der Nummer | account with the number |
| bei der Bank | at the bank |
| mit der Bankleitzahl<br>IBAN<br>BIC | Bank code<br>IBAN<br>BIC |
| lautend auf | Account Holder |
| zu bezahlen. | |
| Gletscherbahnen Kaprun AG und die Republik Österreich verpflichten sich bei Verzug den offenen Betrag mit 4 % per annum ab Fälligkeit zu verzinsen. | In case of default Gletscherbahnen Kaprun AG and the Republic of Austria covenant to pay interest in the amount of 4 % per annum on the outstanding amount. |
| Dieser Verpflichtung tritt die *Generali Versicherung AG*, als Haftpflichtversicherer von *Gletscherbahnen Kaprun AG* im Innenverhältnis, je nach Zureichen der Versiche- | As liability insurer of *Gletscherbahnen Kaprun AG*, *Generali Versicherung AG* (plc) accedes inter partes (internally) the covenant depending on the insurance sum (§156 |

rungssumme (§156 VersVG) bei. Unabhängig davon besteht der Anspruch ausschließlich gegenüber *Gletscherbahnen Kaprun AG und Republik Österreich*.

VersVG – Austrian Insurance Contract Act). Notwithstanding the foregoing, the claim exists exclusively against *Gletscherbahnen Kaprun AG and Republic of Austria*.

2.) Der/die unterfertigte Anspruchsteller erklärt(en), dass er ... auf die zu vergleichende Forderung nachstehende Leistungen von dritter Stelle (z. B. Sozialversicherer etc.) erhalten habe(n) oder beanspruchen könnte(n):

2.) The releasing party declares that he/she has received or may receive any benefits from a third party (e.g. social security, etc.) as stated below:

......................................................

......................................................

......................................................

......................................................

......................................................

......................................................

Der/ die unterfertigte(n) Anspruchsteller erklärt weiterhin, dass er/sie alleinige(r) Inhaber der geltendgemachten Forderungen ist, also eine Abtretung auch nur eines Teiles seiner/ihrer Forderung bzw. eine Einlösung (vgl § 1422 ABGB) weder erfolgt ist, noch erfolgen wird.

The releasing party declares that he/she continues to be the sole holder of the asserted claim, thus the claim has not been and will not be assigned as a whole or in parts nor has the claim been nor will the claim be redeemed (compare § 1422 ABGB – General Civil Code); and no third party is subrogated to the claims of the releasing party.

3.) Mit Erhalt des Vergleichsbetrages sind sämtliche Ansprüche aus dem Vorfall vom 11.11.2000 (Brandkatastrophe Standseilbahn *Gletscherbahnen Kaprun*), auch wenn sie derzeit weder bekannt, noch vorhersehbar sind, gegen wen auch immer, insbesondere auch nach § 156 VersVG aus der bei *Generali Versicherung AG* bestehenden Haftpflichtversicherung, endgültig bereinigt und verglichen (§§ 1380ff ABGB) (siehe auch Beilage ./1 Release, die einen integrierenden Bestandteil dieses Vergleiches darstellt).

3.) With the receipt of the settlement amount all claims resulting from the incident on 11.11.2000 (ski train fire disaster *Gletscherbahnen Kaprun*), even when they are presently unknown or unforeseen, against whomsoever, in particular pursuant to § 156 VersVG resulting from the liability insurance of the *Generali Versicherung AG*, are definitively settled and reassessed (§§ 1380ff ABGB) (see also Attachment ./1 Release, which forms an integrated part of this settlement).

Es wird vereinbart, dass dieser Vergleich jedenfalls für alle im In- oder Ausland anhängigen bzw. anhängig werdenden, auf diesen Vorfall Bezug habenden Verfahren Präjudizwirkung entwickelt, der Anspruch also nirgends mehr geltend gemacht werden kann.

It is agreed that in any case this settlement is a prejudice (*Präjudizwirkung*) for all litigations already initiated or to be initiated in the future at home and abroad relating to this incident, thus the claim can be asserted nowhere.

4. a) In den anhängigen Verfahren wird „ewiges Ruhen" vereinbart, – es wird also auf die Fortsetzung eines jeden auf diesen Vorfall Bezug habenden Verfahrens (auch derzeit nicht bekannter) ebenso verzichtet, wie

4. a) In all pending litigations "ewiges Ruhen" ("eternal rest") is agreed, – the continuation of each proceeding relating to this incident (also proceedings presently unknown) as well as the initiation of such pro-

auf die Einleitung derartiger Verfahren im Inland sowie im Ausland. Sollte die Vereinbarung des „ewigen Ruhens" verfahrenstechnisch nicht möglich sein, verpflichtet sich der/die unterfertigte Anspruchsteller sämtliche auf diesen Vorfall Bezug habenden Klagen unter Anspruchsverzicht zurückzuziehen. Ist also ein anhängiges Verfahren bis zur rechtskräftigen Entscheidung im Strafverfahren oder eines anderen anhängigen Zivilverfahrens unterbrochen, dann wäre Fortsetzungsantrag zu stellen und unter einem dem Gericht von beiden Parteien mitzuteilen, dass „ewiges Ruhen" vereinbart ist, also auf die Fortsetzung dieses Verfahrens immerwährend verzichtet wird. Ist eine solche Vereinbarung verfahrenstechnisch nicht möglich, dann wäre dem Gericht die Klagsrückziehung unter Anspruchsverzicht mitzuteilen, wobei dies als vereinbart gilt, dass ein Kostenersatz nur dann stattfindet, wenn und insoweit er in diesem Vergleich geregelt ist.

Der vorangehende Absatz ist nicht auf US-Amerikanische Staatsbürger anwendbar. US-Amerikanische Staatsbürger vereinbaren mit der Unterzeichnung mit der Gletscherbahnen Kaprun AG und der Generali Versicherung AG die Einstellung unter Anspruchsverzicht sämtlicher gegen wen und wo auch immer anhängigen Gerichtsverfahren im Zusammenhang mit den gegenständlichen Ansprüchen.

b.) Der/die unterfertigte Anspruchsteller verpflichtet sich in etwaigen Sammelklageverfahren eine Opt-Out Erklärung bzw. keine Opt-in Erklärung abzugeben.

5.) Der/die unterfertigte Anspruchstellerverpflichtet sich weiters einen im Strafverfahren zu 37 Hv 60/02 d des Landesgerichtes Salzburg erklärten Privatbeteiligtenanschluss (§§ 47ff Strafprozessordnung) und den zugrunde liegenden Anspruch nicht weiter zu verfolgen bzw. einen solchen nicht zu erklären.

6.) Für Streitigkeiten über das wirksame Zustandekommen dieses Vergleiches sowie aus dem Vergleich selbst, werden zwischen den Parteien dieses Vergleiches – soweit dem keine zwingenden gesetzlichen Bestimmungen entgegenstehen – die Anwendung österreichischen Rechtes, dies unter Ausschluss der Kollisionsnormen des Europäischen Übereinkommens über das auf

ceedings at home and abroad is waived. If for reasons of procedural law an agreement of "ewigen Ruhens" is not possible, the releasing party covenants to withdraw under waiver of a claim (Anspruchsverzicht) all complaints relating to this incident. In case that a pending proceeding is discontinued until the legally binding decision in the criminal procedure or another pending civil litigation, then the parties shall apply for the continuation and shall inform the court that "ewiges Ruhen" has been agreed upon and that a continuation of the proceedings has been irreversibly waived. In case that such agreement is not possible for reasons of procedural law, the court shall be informed about the withdrawal of the action under waiver of a claim, whereas it is agreed that costs of the litigation will only be refunded, if and insofar as it is provided for by this settlement.

The above paragraph shall not apply to releasing parties who are US-American citizens. US-American citizens furnish with the signature hereunder any released parties an executed stipulation of dismissal with prejudice for any pending litigation in which the US-American citizens have sued the released parties on the claims released herein.

b.) The releasing party shall issue an opt-out statement or no opt-in statement respectively of class-action lawsuits(s).

5.) The releasing party covenants furthermore to discontinue the already declared or abstain from declaring accession as joint plaintiff (Privatbeteiligtenanschluss) (§§ 47ff Austrian law of criminal procedure) in the criminal procedure 37 Hv 60/02 d of the regional court of Salzburg.

6.) For disputes concerning the effective establishment of this settlement and for disputes arising out of this settlement – as long as there are no opposing mandatory legal provisions – the parties agree upon the application of Austrian law, under exclusion of the conflict of law rules of the European Convention on the Law applicable to Contractual Obligations (EVÜ) or other interna-

3

vertragliche Schuldverhältnisse anzuwendende Recht (EVÜ) oder anderer Gesetze über das internationale Privatrecht, und die Schlichtung durch mindestens drei Mitglieder der vom Bundesminister für Justiz am 2.3.2004 eingesetzten Vermittlungskommission vereinbert. Ausgeschiedene Mitglieder sind durch die vom Bundesminister für Justiz nachnominierten Personen zu ersetzen. Im Fall der Verhinderung eines oder mehrerer Mitglieder bestimmt der Vorsitzende der Vermittlungskommission entsprechende Ersatzmitglieder für das konkrete Schlichtungsverfahren.

Endet die Schlichtung nicht innerhalb von drei Monaten ab Anrufung der Vermittlungskommission durch einen Vergleich, dann ist die Klage an das ordentliche Gericht zulässig, wobei die ausschließliche Zuständigkeit des für Wien Innere Stadt sachlich zuständigen Gerichtes vereinbart wird.

Diese Regelung gilt nicht für das Verhältnis zwischen den Anspruchstellern und ihren Rechtsvertretern sowie zwischen den Anspruchstellern untereinander.

---

tional conflict of laws rules, and the mediation (Schlichtung) by at least three members of the mediation commission (Vermittlungskommission) appointed by the Austrian Federal Minister for Justice on March 2nd 2004. Retired members are to be replaced by the members appointed by the Austrian Federal Minister of Justice at their place. In case that one or more members are hindered, the chairman of the mediation commission appoints replacement members for the specific mediation.

In case that the mediation does not lead to a settlement within three months starting with the referral to the mediation commission, then an action may brought to the ordinary courts, whereas the exclusive jurisdiction of the competent court for Vienna Inner City is agreed upon.

This regulation does not apply for the relation between claimants and their legal representatives as well as for claimants among each other.

| German | English |
|---|---|
| 7.) Diese Vereinbarung wird erst mit Rechtskraft einer allenfalls erforderlichen gerichtlichen oder behördlichen Genehmigung (Pflegschaftsgericht, Abhandlungsgericht, etc.) wirksam. | 7.) This agreement shall come into force if need be with a necessary legal or official approval (e.g. custodian court, trusteeship court). |
| 8.) Sollten einzelne Bestimmungen dieser Vereinbarung zur Gänze oder teilweise ungültig sein oder werden, so wird dadurch die Gültigkeit der übrigen Bestimmungen nicht berührt. In einem solchen Fall ist die ungültige Bestimmung in dem Sinne umzudeuten oder zu ergänzen, dass der damit beabsichtigte wirtschaftliche Erfolg erreicht wird. | 8.) Should one or more provisions of this agreement are or become void as a whole or in part, the validity of the rest of this settlement will not be affected. In that case, the invalid provision shall be reinterpreted or amended, in order to achieve the initially intended economic result. |
| 9.) Dieser Vergleich wurde in deutscher Sprache erstellt und gegebenenfalls in andere Sprachen übersetzt. Im Falle von inhaltlichen Abweichungen ist ausschließlich die deutsche Fassung maßgeblich. | 9.) This settlement has been established in German language and as the case may be translated in other languages. In the case of discrepancies regarding the content the German version is exclusively applicable. |

No Certifie Translations

4

| | |
|---|---|
| 10.) Der einseitig durch den unterfertigten Anspruchsteller unterschriebene Vergleich ist ein Anbot des unterfertigten Anspruchstellers und bindet diesen bis zum 31.12.2008 und muss bis spätestens 30.4.2008 beim Vorsitzenden der Vermittlungskommission einlangen. Dieser Vergleich wird wirksam, wenn *Gletscherbahnen Kaprun AG, Generali Versicherung AG (im Innenverhältnis)* und Republik Österreich bis zum 31.12.2008 die Annahme gegenüber dem Vorsitzenden der Vermittlungskommission erklärt haben und etwaig erforderliche Genehmigungen gemäß Pkt 7 dieses Vergleiches rechtskräftig vorliegen. | 10.) A settlement unilaterally signed by the releasing party is a binding offer until 31.12.2008 and has to be sent to the chairman of the mediation commission (*Vermittlungskommission*) until 30.4.2008. This settlement becomes effective if *Gletscherbahnen Kaprun AG* and the Republic of Austria declare the acceptance by a statement to the chairman of the mediation commission (*Vermittlungskommission*) until 31.12.2008 and possibly necessary legal or public approvals have been validly received. |

Beglaubigte Unterschrift des unterfertigten Anspruchstellers
Certified signature of Claimant

5

# EXHIBIT  2

*\* Purported Release Document*

] *No Certified translations*

Diese Übersetzung in die deutsche Sprache ist eine Arbeitsübersetzung, wobei ausdrücklich festgehalten wird, dass die englische Fassung („Release") die verbindliche Fassung in jeglicher Hinsicht darstellt.

This German translation is a Working Translation only. It is clearly understood that the English Version (RELEASE) prevails at any time in fact and in law.

## RELEASE

To all to whom these presents shall come or may concern, know that the releasing party on behalf of herself and on behalf of the estate and on behalf of its heirs, executors and administrators (hereinafter referred to individually and collectively as "RELEASORS", jointly and severally, for good and valuable consideration received from GLETSCHERBAHNEN KAPRUN AG, receipt whereof is acknowledged by signing the Settlement Agreement, hereby forever release and forever discharge and acquit

GLETSCHERBAHNEN KAPRUN AG, GENERALI VERSICHERUNG AG, REPUBLIC OF AUSTRIA, OESTERREICHISCHE ELEKTRIZITAETSGE-SELLSCHAFT AG, SIEMENS AG OESTERREICH, THYSSENKRUPP AG, BAUBEDARFSZENTRUM STADLBAUER AG, SWOBODA KAROSSERIE UND STAHLBAU GmbH, LEITNER LIFTS USA, LEITNER S.p.A., TUEV OSTERREICH, TAUERN TOURISTIK GmbH, HEITKAMP, INC., E. HEITKAMP GmbH, HEITKAMP-DEILMAN-HANIEL GmbH, TUV RHEINLAND HOLDING AG, TUV RHEINLAND OF NORTH AMERICA, INC., TUV INTERNATIONAL GmbH, WAAGNER-BIRO BINDER AG IN ABWICKLUNG, WAAGNER-BIRO BINDER BETEILIGUNGS AG, WB HOLDING AG, BINDER + CO AG, VERBUND-AUSTRIAN HYDRO POWER AG, BETON-UND MONIERBAU, G.m.b.H., THYSSEN SCHACHTBAU, G.m.b.H., INTERSPORT INTERNATIONAL CORPORATION, INTERSPORT AUSTRIA GmbH, OMNIGLOW CORPORATION, SIEMENS CORPORATION, SIEMENS AG, BOSCH REXROTH AG, AND BOSCH REXROTH CORPORATION, SIEMENS PSE (PSC) TECHLABS, VA TECH, VA TECH ELIN EBG, VA TECH HYDRO AG, VA TECHNOLOGIE, VA TECH ELIN USA CORPORATION, VA TECH AMERICAN CORPORATION, VOEST-ALPINE SERVICES & TECHNOLOGY CORP., AMERICAN PERMALIGHT INC., MARYLCO INC., DEAN REESE, DRAN REESE, REXROTH CORPORATION INDUSTRIAL HYDRAULICS DIVISION, tuv RHEINLAND GMBH, TUV CONSULT OESTERREICH-RHEINLAND GMBH, INTERSPORT MARKETING USA, INC.,

## FREIZEICHNUNGSERKLÄRUNG

Jeder Person, der diese Urkunde vorgelegt wird oder die diese betrifft, wird hiermit mitgeteilt, dass die verzichtende Partei im eigenen Namen und im Namen des Nachlasses und im Namen seiner/ihrer Erben, Erbschaftsverwalters und Verlassenschaftskurators (im Nachfolgenden einzeln und gemeinsam als „RELEASORS" bezeichnet), gemeinsam und jeder einzeln für sich aufgrund angemessener Vergütung durch GLETSCHERBAHNEN KAPRUN AG, dessen Empfang mit der Unterfertigung des Vergleichs bestätigt wird, unwiderruflich nachstehende Parteien sowie sämtliche Mutter- und Tochtergesellschaften, mit ihnen verbundene Unternehmen, Betriebsstätten, Vorstände, leitende Angestellte, Stellvertreter, Mitglieder, Partner, Gesellschafter, Erben, Erbschaftsverwalter, Verlassenschaftskuratoren, Gesamt- und Einzelrechtsnachfolger nachstehender Parteien (im Nachfolgenden einzeln und gemeinsam als „RELEASEES") von sämtlichen Ansprüchen, Schulden, Forderungen, Klagegründen, Verlusten, Klagen, Verpflichtungen, Kosten, Schäden, Streitgegenständen (controversies), Urteilen, Haftung und anderer Anspruch aus welcher Rechtsgrundlage immer, bekannt oder unbekannt, bestritten oder unbestritten, bedingt oder unbedingt, auf Billigkeit (equity) oder gesetzlicher Grundlage beruhend oder solche, die sie jemals hatten, zur Zeit haben oder in Zukunft aufgrund, wegen oder im Zusammenhang mit dem Seilbahnunglück in Kaprun, Österreich, vom 11 November 2000 (gemeinsam als „CLAIMS" bezeichnet), haben werden, von deren Haftung entbindet und von sämtlichen Verbindlichkeiten befreit:

GLETSCHERBAHNEN KAPRUN AG, GENERALI VERSICHERUNG AG, REPUBLIK ÖSTERREICH, OESTERREICHISCHE ELEKTRIZITAETSGE-SELLSCHAFT AG, SIEMENS AG OESTERREICH, THYSSENKRUPP AG, BAUBEDARFS-ZENTRUM STADLBAUER AG, SWOBODA KAROSSERIE UND STAHLBAU GmbH, LEITNER LIFTS USA, LEITNER S.p.A., TUEV OSTERREICH, TAUERN TOURISTIK GmbH, HEITKAMP, INC., E. HEITKAMP GmbH, HEITKAMP-DEILMAN-HANIEL GmbH, TUV RHEINLAND HOLDING AG, TUV RHEINLAND OF NORTH AMERICA, INC.,

AMERICAN CYANAMID INC., HYDAC TECHNOLOGY CORP., WIKA INSTRUMENTS AG, WIKA INSTRUMENT CORPORATION, WIKA ALEXANDER WIEGAND GMBH & CO KG, SIEMENS TRANSPORTATION SYSTEMS CORP., ROBERT BOSCH CORP., EXXON MOBIL CORPORATION, WYETH HOLDINGS CORPORATION, AUSTRIAN TOURIST OFFICE, INC., OESTERREICH WERBUNG, AUSTRIAN TRADE COMMISSION, AUSTRIAN MINISTRY OF ECONOMICS AND LABOR, THE BOSCH GROUP, WESTINGHOUSE ELECTRIC COMPANY, LLC, CYALUME TECHNOLOGIES INC., OMNIGLOW LLC, CALUME TECHNOLOGIES INC., OMNIGLOW LIMITED PARTNERS OF NY, SCIENS CAPITAL PARTNERS, HYDAC INTERNATIONAL AG, HYDAC CORPORATION, SWOBODA KAROSSERIE AG, AUSTRIAN NATIONAL TOURIST OFFICE, INC., FACHVERBAND DER SEILBAHNEN, AUSTRIAN MINISTRY OF TRANSPORTATION, STATE OF SALZBURG, MUNICIPALITY OF KAPRUN, EUROPA SPORTREGION GMBH, SALZBURGER LAND TOURISMUS GMBH, ROBERT BOSCH GMBH, ROBERT BOSCH AG, BOSCH REXROTH PNEUMATICS, BOSCH REXROTH MOBILE HYDRAULICS, BOSCH REXROTH CORPORATION HYDRAULICS DIVISION, MANNESMANN REXROTH CORPORATION, REXROTH BOSCH GROUP, SIEMENS TRANSPORTATION SYSTEMS GMBH & CO KG, SIEMENS SHARED SYSTEMS, SIEMENS TRANSPORTATION SYSTEMS CORP., TRANSRAPID INTERNATIONAL and each of their parents, subsidiaries, affiliates, divisions, directors, officers, agents, members, partners, shareholders, heirs, executors, administrators, successors and assigns (hereinafter referred to individually and collectively as the "RELEASEES"), from any and all claims, debts, demands, causes of action, losses, suits, obligations, costs, damages, controversies, judgments, liabilities and other claims of any kind or nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, in equity or in law or otherwise, that they ever had, now have or in the future can, shall or may have for, upon, or by reason of the ski train fire in Kaprun, Austria on November 11, 2000 (collectively, the "Claims").

TUV INTERNATIONAL GmbH, WAAGNER-BIRO BINDER AG IN ABWICKLUNG, WAAGNER-BIRO BINDER BETEILIGUNGS AG, WB HOLDING AG, BINDER + CO AG, VERBUND-AUSTRIAN HYDRO POWER AG, BETON-UND MONIERBAU, G.m.b.H., THYSSEN SCHACHTBAU, G.m.b.H., INTERSPORT INTERNATIONAL CORPORATION, INTERSPORT AUSTRIA GmbH, OMNIGLOW CORPORATION, SIEMENS CORPORATION, SIEMENS AG, BOSCH REXROTH AG, AND BOSCH REXROTH CORPORATION, SIEMENS PSE (PSC) TECHLABS, VA TECH, VA TECH ELIN EBG, VA TECH HYDRO AG, VA TECHNOLOGIE, VA TECH ELIN USA CORPORATION, VA TECH AMERICAN CORPORATION, VOEST-ALPINE SERVICES & TECHNOLOGY CORP., AMERICAN PERMALIGHT INC., MARYLCO INC., DEAN REESE, DRAN REESE, REXROTH CORPORATION INDUSTRIAL HYDRAULICS DIVISION, TUV RHEINLAND GMBH, TUV CONSULT OESTERREICH-RHEINLAND GMBH, INTERSPORT MARKETING USA, INC., AMERICAN CYANAMID INC., HYDAC TECHNOLOGY CORP., WIKA INSTRUMENTS AG, WIKA INSTRUMENT CORPORATION, WIKA ALEXANDER WIEGAND GMBH & CO KG, SIEMENS TRANSPORTATION SYSTEMS CORP., ROBERT BOSCH CORP., EXXON MOBIL CORPORATION, WYETH HOLDINGS CORPORATION, AUSTRIAN TOURIST OFFICE, INC., OESTERREICH WERBUNG, AUSTRIAN TRADE COMMISSION, AUSTRIAN MINISTRY OF ECONOMICS AND LABOR, THE BOSCH GROUP, WESTINGHOUSE ELECTRIC COMPANY, LLC, CYALUME TECHNOLOGIES INC., OMNIGLOW LLC, CALUME TECHNOLOGIES INC., OMNIGLOW LIMITED PARTNERS OF NY, SCIENS CAPITAL PARTNERS, HYDAC INTERNATIONAL AG, HYDAC CORPORATION, SWOBODA KAROSSERIE AG, AUSTRIAN NATIONAL TOURIST OFFICE, INC., FACHVERBAND DER SEILBAHNEN, AUSTRIAN MINISTRY OF TRANSPORTATION, STATE OF SALZBURG, MUNICIPALITY OF KAPRUN, EUROPA SPORTREGION GMBH, SALZBURGER LAND TOURISMUS GMBH, ROBERT BOSCH GMBH, ROBERT BOSCH AG, BOSCH REXROTH PNEUMATICS, BOSCH REXROTH MOBILE HYDRAULICS, BOSCH REXROTH CORPORATION HYDRAULICS DIVISION, MANNESMANN REXROTH CORPORATION, REXROTH BOSCH GROUP, SIEMENS TRANSPORTATION SYSTEMS GMBH & CO KG, SIEMENS SHARED SYSTEMS, SIEMENS

TRANSPORTATION    SYSTEMS    CORP.,
TRANSRAPID INTERNATIONAL.

This RELEASE is further intended to release all Claims that has ... ... ever had, now have or hereafter can, shall or may have against not only the RELEASEES, but any other entity and its parents, subsidiaries, affiliates, divisions, directors, officers, agents, members, partners, shareholders, heirs, executors, administrators, successors and assigns for, upon, or by reason of the Claims.

Mit dieser FREIZEICHNUNG wird weiters beabsichtigt, dass auf alle CLAIMS, die RELEASORS nicht nur gegen RELEASEES sondern auch gegen deren Mutter- und Tochtergesellschaften, mit ihnen verbundene Unternehmen, Betriebsstätten, Vorständen, leitende Angestellte, Stellvertreter, Mitglieder, Partner, Gesellschafter, Erben, Erbschaftsverwalter, Verlassenschaftskuratoren, Gesamt- und Einzelrechtsnachfolger hatten oder haben werden, verzichtet wird.

This RELEASE is made in connection with the Settlement Agreement dated as of April 2008 (the "Settlement Agreement"), between releasing party, GLETSCHERBAHNEN KAPRUN AG and the Republic of Austria.   It is clearly understood that this RELEASE forms an integral part of the Settlement Agreement. By Signing the Settlement Agreement, RELEASE/Claimant explicitly agrees to the provisions of this RELEASE.

Diese FREIZEICHNUNG wird im Zusammenhang mit dem Vergleich vom April 2008 (das „Settlement Agreement") zwischen der verzichtenden Partei und GLETSCHERBAHNEN KAPRUN AG und der Republik Österreich errichtet. Festgestellt wird, dass diese FREIZEICHNUNG einen integrierenden Teil des Vergleichs („Settlement Agreement") darstellt. Mit der Unterzeichnung des Vergleichs stimmt der Anspruchsteller/die verzichtende Partei den Bestimmungen dieses Vergleichs ausdrücklich zu.

This RELEASE may not be changed orally.

Diese FREIZEICHNUNG kann mündlich nicht abgeändert werden.

3/3

# EXHIBIT  3

Settlement reached in Austria cable car deaths



Home Page > News > World > Stories

# Settlement reached in Austria cable car deaths

June 17, 2008 - 9:51am
By WILLIAM J. KOLE
Associated Press Writer

VIENNA, Austria (AP) - Relatives of 155 people who died when fire raged through a crowded alpine cable car in 2000 will share euro13.9 million (US$21.5 million) in compensation, Austrian authorities announced Tuesday.

The settlement ends more than seven years of legal wrangling that stemmed from Austria's worst peacetime disaster. A total of 451 claimants will split the settlement.

Klaus Liebscher, governor of the Austrian Central Bank and chairman of a compensation commission, said the money would be paid out immediately.

The passengers died on Nov. 11, 2000, when a fire blamed on a faulty heater swept through the car packed with skiers and snowboarders. The blaze broke out as the car passed through a mountain tunnel on its way to the summit of Austria's popular Kitzsteinhorn glacier near the ski resort of Kaprun.

Only 12 people escaped. Most of the victims were from Austria and Germany. Eight were Americans, and the others were from Japan, Slovenia, the Netherlands and Britain.

All 451 claimants signed the settlement on June 12, Liebscher said. He said the agreement stipulates that the relatives abandon any pending lawsuits seeking compensation.

The cash would be paid under a sliding scale, and amounts would differ depending on a claimant's relation to the victim, Liebscher added.

There was no immediate reaction from victims' groups, who had sought higher damages in class-action lawsuits filed in Austria and the U.S. In Europe, compensation in such cases is typically significantly lower than the multimillion-dollar sums sometimes awarded by U.S. courts.

Austrian prosecutors charged 16 people with criminal negligence in the disaster, including employees of Gletscherbahnen Kaprun AG, which operated the cable car; employees of the company that manufactured the car; technicians, and two government officials.

In February 2004, a court acquitted all 16. Eight later were retried on appeal and again acquitted.

Relatives at one point sought to take their case to the European Court of Human Rights in Strasbourg, France, but that court refused to hear it.

Liebscher said 23 of 28 claimants from Japan sent a fax in recent days declaring their intent to withdraw from the agreement. However, he said Austria would consider it legally binding and the Japanese relatives would have no further recourse.

The Austrian government, Gletscherbahnen Kaprun AG and the Generali insurance company all paid into the compensation fund, officials said.

(Copyright 2008 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.)

< Back

# EXHIBIT   4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/14/08

| | | |
|---|---|---|
| IN RE: SKI TRAIN FIRE IN KAPRUN, AUSTRIA ON NOVEMBER 11, 2000 | : | MDL. No. 1428 (SAS) |
| | : | |
| John S. Habblett, et al. v. Bosch Rexroth AG, et al. | : | 02 Civ. 3101 SAS |
| | : | |
| John S. Habblett, et al. v. Omni-Glow Corporation, et al. | : | 02 Civ. 2492 SAS |
| | : | |
| John S. Habblett, et al. v. Leitner Lifts USA Inc., et al. | : | 02 Civ. 266 SAS |
| | : | |
| John S. Habblett, et al. v. Siemens, AG, et al. | : | 01 Civ. 6554 SAS |
| | : | |
| Rudolph Kern, et al. v. Leitner Lifts USA Inc., et al. | : | 01 Civ. 264 SAS |
| | : | |
| Dr. Dick Baker, et al. v. Leitner Lifts USA Inc., et al. | : | 01 Civ. 817 SAS |
| | : | |
| Filkil v. Omniglow Corp., et al. | : | 04 Civ. 4966 SAS |
| | : | |
| Filkil v. Omniglow Corp, et al. | : | 03 Civ. 8813 SAS |
| | : | |

Filkil v. Siemens Corp., et al.          :          03 Civ. 5324 SAS

_____ :

Filkil v. Omniglow Corp., et al.        :          04 Civ. 1403 SAS

_____ :

Goodridge v. Siemens AG., et al.      :          06 Civ. 172 SAS

_____ :

## STIPULATION OF DISMISSAL WITH PREJUDICE

**IT IS HEREBY STIPULATED AND AGREED** by and between the Plaintiffs

herein and Omniglow Corporation, that the above-captioned actions are dismissed, with

prejudice, as to Omniglow Corporation.

This stipulation may be filed without further notice with the Clerk of the Court.

Bartlett, McDonough, Bastone & Monaghan          Nagel Rice LLP

By: _E. Gordon Haesloop_                                          By: _____

E. Gordon Haesloop, Esq.                                          Jay J. Rice, Esq.
Attorneys for Defendants                                          Attorneys for Plaintiffs
Omniglow Corporation                                              103 Eisenhower Parkway
300 Old Country Road, Suite 301                            Roseland, NJ 07068
Mineola, NY 11501                                                  Tel. 973-618-0400
Tel. 516- 877-2900


DATED:        New York, New York
                    May ___, 2008


SO ORDERED:

_____
HONORABLE SHIRA A. SCHEINDLIN,        7/14/08
U.S.D.J.
United States District Court
Southern District of New York